# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT CINCINNATI

LAWRENCE DANGERFIELD,

            Petitioner,     :     Case No. 1:20-cv-582

    - vs -                          District Judge Timothy S. Black
                                     Magistrate Judge Michael R. Merz

WARDEN, Southeastern
  Correctional Complex,

                                :
            Respondent.

## SUPPLEMENTAL REPORT AND RECOMMENDATIONS

This habeas corpus case, brought *pro se* by Petitioner Lawrence Dangerfield under 28 U.S.C. § 2254, is before the Court on Petitioner's Objections (ECF No. 11) to the Magistrate Judge's Report and Recommendations recommending dismissal of the Petition (the "Report," ECF No. 10).  The Warden has responded to Petitioner's Objections (ECF No. 12) and District Judge Black has recommitted the case to the Magistrate Judge for reconsideration in light of the Objections (Order, ECF No. 13).

Dangerfield pleaded five grounds for relief, but has objected only to the Report's conclusion on Grounds One and Two.  Thus no further analysis is needed on Grounds Three, Four, and Five.

**Ground One:  Failure to Grant Motion to Suppress**

In his First Ground for Relief, Dangerfield claims the photo array presented to eyewitness Dennis Medley was unduly suggestive and should therefore have been suppressed.  Respondent agreed that this issue had been preserved for merits determination in habeas and argued this Court should defer to the merits decision of the Ohio First District Court of Appeals.  The Report concluded that the First District's decision was not an unreasonable application of the controlling Supreme Court precedent, *Neil v. Biggers*, 409 U.S. 188 (1972), and *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

The Report relies on the controlling Sixth Circuit application of *Neil*, *Howard v. Bouchard*, 405 F.3d 459, 469 (6th Cir. 2005).  In that case the circuit court held "an identification procedure violates a defendant's right to due process if it "was so unnecessarily suggestive as to run the risk of irreparable mistaken identification." *Id.* at 469.  Even if an identification procedure was impermissibly suggestive, the identification is still admissible if it is reliable. *Id.* at 469, 472.

Dangerfield continues to object that the photo array was impermissibly suggestive in violation of the first prong of *Neil*.  The Supreme Court has recently held that for a pre-trial identification procedure to be "'impermissibly suggestive,' the procedure must 'give rise to a very substantial likelihood of irreparable misidentification.'" *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2559 (2018), *quoting Neil v. Biggers,* 409 U.S. 188, 197 (1972).

The First District described the identifying eyewitness as follows:

> Dennis Medley, Jr., the owner of an auto repair shop, was driving south on Reading Road at the same time [Jan. 18, 2015, just before 11:00 p.m.] and observed a heavily damaged silver BMW, streaming coolant from its radiator, driving north. The front windshield was heavily cracked.  Medley observed the driver as the cars passed. Medley called 911 and described the driver as "a black

2

> male with a beanie on his head* * * [h]air on his face," and distinctive eyes and nose. Medley subsequently picked Dangerfield's photo out of an eight-image police photo lineup and identified Dangerfield as the driver during trial.

*State v. Dangerfield*, Case No. C-180057 (Ohio App. 1st Dist. Jun. 28, 2019)(unpublished; copy at State Court Record, ECF No. 6, PageID 98). Dangerfield does not dispute any of the factual findings in this paragraph.

The First District's factual findings about Medley's pre-trial identification are:

> Within a few days of the accident, Medley identified Dangerfield as the driver of the BMW from a photo lineup of eight photos of African-American men shown to him by a blind administrator, an officer not involved in the investigation. Each photo showed an African-American male with a beard and roughly similar features. The other seven photos had been selected from a computer database to match Dangerfield's characteristics. Medley was not told that the suspect's photo was in the lineup. The skin tone of the subjects varied, but the instructions had cautioned that "Photographs may not always depict the true complexion of a person. It may appear lighter or darker in the photograph." The photo of Dangerfield showed him wearing a dark brown or black cap, very similar in shade to his hair color, and much darker than the cap he had worn the night that he struck Denson.

*Id.* at PageID 100.

Dangerfield does not dispute several factual findings in this paragraph, including that the photo array contained eight photographs of African-American men, that it was not shown to Medley until several days after the collision, that it was shown by a blind administrator[1] (i.e. that it was shown to Medley by a police officer who was not involved in the investigation and who did not know which of the eight photographs was a picture of Dangerfield), and that the photographs of the other seven men were chosen from a computer database.

Dangerfield objects that the other seven photographs were chosen by an investigating

---

[1] Dangerfield specifically says he is not objecting to the administration of the photo array, but claiming that the array itself was suggestive (Objections, ECF No. 11, PageID 1396).

3

officer, Officer Enneking, and:

> A review of those photo's reveal that all seven photos clearly are distinguishable from that of Petitioner's photo. Petitioner['s] photo show him wearing a beanie. None of the seven other individuals are waering [sic] beanies. Further, the beanie is not the same color as alleged by medley [sic]. Petitioner's photo also show him with a long beard and no greys. None of the other seven photo's [sic]have the other individuals with long beards. Another known fact is that Petitioner is a light skinned male. Only one other individual in the seven photo line up was a light skinned male besides Petitioner, but he had a beard that was fully grey and no beanie.

(Objections, ECF No. 11, PageID 1395-96).

Dangerfield makes numerous factual assertions in his objections which he says show the photo array was suggestive. However, he makes no record citations for that supposed evidence, despite the fact that he has been furnished with a full copy of the State Court Record as filed and was ordered to cite to the PageID number of any record reference.[2]

In an attempt to find the record evidence to which Petitioner refers, the Magistrate Judge has reviewed the transcript of the motion to suppress hearing which occurred September 14, 2017[3] (ECF No. 6-1, PageID 292, et seq.) John Enneking testified that he had been a police officer of the City of Cincinnati for twenty-nine years. *Id.* at PageID 294. His area of assignment is serious and fatal crashes and hit-skip occurrences. *Id.* at PageID 295. On January 18, 2015, he was called from home to the scene of the crash in suit. While at the scene investigating the fatal crash, he received word from Cincinnati Police District 4 that a car that might have been involved was located about half a mile from the scene. *Id.* at PageID 297. Dangerfield was identified as a suspect

---

[2] "All papers filed in the case thereafter [after the record is filed], by either party, including the answer and the exhibit index, shall include record references to the PageID number." (Order, ECF No. 4, PageID 22.)

[3] The hearing occurred more than a year and a half after the crash. This probably accounts for some lapses of memory by Officer Enneking. For example, he could not recall the day of the week on which the collision occurred. *Id.* at PageID 317.

at that time and taken in for questioning. He learned that an Officer Jerry Stephens had received a call from Dennis Medley who claimed to be a witness. *Id.* at PageID 300. Dangerfield's photograph was retrieved from the OHLEG website and used as a "seed" to develop a photo array of persons with the same characteristics as the suspect, including race and facial hair. *Id.* at PageID 301. The witness's description would also be used which Officer Enneking recalled as "male, black, wide nose, beard, grayish beard." *Id.* at PageID 301. The other seven photographs were drawn from a computer database. Dangerfield's attorney did not ask foundational questions about how the computer would go about doing that, how large the database was, etc. Hence there is no evidence to support Dangerfield's speculation that Enneking intentionally chose persons who did not meet Medley's description.

Dangerfield argues that he was only one of two light-skinned men in the array, but Medley's description only says "black," not light-skinned, and the characterization of Dangerfield as "light-skinned" is his own. Dangerfield complains that on the night in question he was wearing a light-colored kufi or "beanie," but his picture in the array has a dark kufi. That point contradicts his claim of suggestiveness: it would have been more suggestive to put in his picture with the light kufi he was wearing January 18, 2015. Petitioner also complains that his picture in the array shows him with a beard without grey in it, whereas Medley's description was of a "grayish" beard. This is also counter-suggestive: Medley's beard description more closely matches the other bearded man in the array.

Although the Magistrate Judge has reviewed the transcript of the suppression hearing, he has not looked at the photo array itself. Dangerfield claims it is part of the record, but it is not in the State Court Record filed by Respondent and ordinarily this Court does not see admitted exhibits from the trial court. Even if the array had been made part of the State Court Record here, the Court

would not review it *de novo*, i.e. to decide for itself if the array was suggestive. Rather the question in habeas is whether the state courts' decision that the array is not unduly suggestive is objectively unreasonable. Given the actual evidence cited above, it was not.

Even if the array had been unduly suggestive, Dangerfield would not be entitled to have Medley's identification suppressed unless he also met the second prong of *Neil* by showing that the identification was unreliable. In finding against Dangerfield on the second prong, the Magistrate Judge noted the following:

> [Medley] is an automobile mechanic and immediately identified the vehicle leaving the scene as a damaged silver BMW. Dangerfield was found with a silver BMW relatively near the accident scene and with an abrasion on his forehead. His DNA was in the car and the victim's blood was on the outside of the car. The BMW he was with had a cracked windshield and was missing the front bumper; that BMW front bumper with an identifying license plate was found at the scene. Dangerfield matched the description Medley gave the police at the scene. Dangerfield points to no evidence that these incriminating facts are mere coincidence.

(Report, ECF No. 10, PageID 1376). Dangerfield makes no objection to these findings in the Report. The cited circumstantial evidence is strong proof that Medley's identification is reliable. Dangerfield's objections to the Report as to the First Ground for Relief should therefore be overruled.

**Ground Two: Insufficient Evidence**

In his Second Ground for Relief, Dangerfield claimed that the State presented insufficient evidence to show that he possessed the requisite mental state – recklessness – to convict him of aggravated vehicular homicide. Dangerfield's argument to the First District was that the evidence

6

showed that he was only speeding and that is insufficient for a finding of recklessness. The First District found that the accident reconstructionist's report supported a finding that he was driving between 59 and 72 miles per hour when he struck the victim. The posted *prima facie* speed limit on that portion of Reading Road, a residential neighborhood, in January 2015 was 30 miles per hour. *State v. Dangerfield, supra,* at PageID 102-03. It was about 11:00 p.m. when the collision occurred and the victim had just alighted from a public transit bus and was attempting to cross Reading Road when Dangerfield struck her while passing the bus. The victim's companions did not hear any indicia of an attempt to stop by Dangerfield, whose driver's license was suspended at the time. *Id.*

> Overruling Dangerfield's insufficiency of the evidence claim, the First District concluded:
>
>> Dangerfield's excessive speed, when combined with the circumstances surrounding the incident, showed a "heedless indifference to the consequences" of and disregard for a known risk that his conduct was likely to cause. *Napier* at * 4. Thus the record reflects substantial, credible evidence from which the jury could have reasonably concluded that the state had proved all elements of aggravated vehicular homicide beyond a reasonable doubt, including that Dangerfield had killed Denson recklessly. See *Waddy*, 63 Ohio St.3d at 430, 588 N.E.2d 819; see also *Moore* at ¶ 8. The second assignment of error is overruled.

(Judgment Entry, State Court Record, ECF No. 6, PageID 102-03). The Report recommended deferring to this conclusion as an objectively reasonable application of *Jackson v. Virginia*, 443 U.S. 307 (1979).

In his Objections, Dangerfield concedes that Ohio law permits a finding of recklessness when something more than speeding is presented, e.g., intoxication or driving on a suspended license (ECF No. 11, PageID 1397). Dangerfield correctly points out there is no evidence he was under the influence of alcohol. The First District found his license was suspended. He claims he had a valid Texas driver's license, but cites no place in the record where that is shown. *Id.* The

7

First District found he lived at the place where he stopped the BMW. A valid Texas license does not authorize driving in Ohio by an Ohio resident.

Dangerfield's principal reliance is on his claim that speeding is speeding:

> Whether it was night or day, raining or dry, foggy or wet, in a residential area, highway, or school zone, speeding is speeding, no matter the posted speed limits. Whether a[n] individual is going one mile or a hundred miles over the speed limit, its still speeding.

(Objections, ECF No. 11, PageID 1397).

This represents a serious misunderstanding of Ohio law. Ohio Revised Code § 4511.21 prohibits driving "at a speed greater or less than is reasonable or proper, having due regard to the traffic, surface, and width of the street or highway and any other conditions . . . ." The statute then goes on to list the prima facie reasonable speed limits which are to be posted. All of the factors listed by the First District – darkness, residential neighborhood, passing a transit bus, driving on a suspended license, and driving at twice the posted prima facie limit – all show that Dangerfield was doing more than "just" speeding.

In any event, it is Ohio law that determines what is sufficient evidence of recklessness for aggravated vehicular homicide. To put it another way, there is no federal constitutional definition of what must be shown to prove recklessness. The First District's determination that the facts shown beyond a reasonable doubt in Dangerfield's case are enough to prove recklessness is binding on this Court. *Bradshaw v. Richey*, 546 U.S. 74 (2005).

Dangerfield's Objections as to the Second Ground for Relief should also be overruled.

**Conclusion**

Having reconsidered the Report in light of the Objections, the Magistrate Judge again

respectfully recommends that the Petition be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, it is also recommended that Petitioner be denied a certificate of appealability and that the Court certify to the Sixth Circuit that any appeal would be objectively frivolous and should not be permitted to proceed *in forma pauperis*.

April 5, 2021.

s/ *Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Because this document is being served by mail, three days are added under Fed.R.Civ.P. 6, but service is complete when the document is mailed, not when it is received. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal.